UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANTHONY A. POLETTI,

        Plaintiff,

    v.

SHAWN HATTON,

        Defendant.

Case No. 17-cv-01936-JST

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Anthony A. Poletti, challenging the validity of his state court criminal conviction. ECF No. 1. Respondent has filed an answer to the petition, and petitioner has filed a traverse. ECF Nos. 8-1, 12. For the reasons set forth below, the petition is denied.

## I.    PROCEDURAL HISTORY

On September 18, 2013 a Santa Cruz jury found petitioner guilty of two counts of forcible lewd touching of a child, Cal. Penal Code § 288(b)(1). ECF No. 1 at 13. On December 2, 2013 the court sentenced him to 18 years and 8 months in state prison. Id. On October 1, 2015, the California Court of Appeal affirmed his conviction. Id. at 13-14. The California Supreme Court denied the Petitioner's petition for review on January 20, 2016. Id. at 14. Petitioner did not pursue state collateral review. Id. This petition was filed on April 4, 2017.

The petition is timely. The Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-32, 110 Stat. 1214 (Apr. 24, 1996) (hereinafter "AEDPA") imposes a one-year limitations period, which begins to run on the date "judgment became final by the conclusion of direct review." See 28 U.S.C. § 2244(d)(1)(A). Petitioner's judgment became final on April 19, 2016, 90 days from the date the California Supreme Court denied his petition for review. See Bowen v.

Roe, 188 F.3d 1157, 1159 (9th Cir. 1999) (period of "direct review" after which state conviction becomes final for purposes of § 2244(d)(1) includes the 90-day period for filing a petition for certiorari in the United States Supreme Court, whether or not such a petition is filed). The petition was therefore filed before the statutory deadline of April 20, 2017. See Corjasso v. Ayers, 278 F.3d 874, 877 (9th Cir. 2002) (explaining that AEDPA's one-year statute of limitations begins to run the day after the conviction becomes final).

## II. STATEMENT OF FACTS

The following background facts describing the prior proceedings and crime and evidence presented at trial are from the opinion of the California Court of Appeal[1]:

### A. Defendant is Charged

The Santa Cruz County District Attorney filed a 17-count information against defendant in August 2008. It charged defendant with five counts of forcible lewd acts upon a child under age 14 . . . . The alleged victim of the charged sexual abuse was defendant's step-daughter.

### B. The First Trial and Appeal

Defendant was tried and convicted of all but two of the charged offenses. He was acquitted of one count of forcible rape (count 11) and one count of lewd acts upon a child aged 14 or 15 (count 12). Both of those charges related to the alleged Winter Break rape. The trial court sentenced defendant to 68 years eight months in prison.

On appeal, [the California Court of Appeal] reversed. In a nonpublished opinion, [the court] concluded juror misconduct had occurred that required reversal of 12 counts of various forms of child molestation. [The court] also concluded that no substantial evidence supported the conviction on count 13 for forcible rape in June, 2007. In reaching the latter conclusion, [the Court} noted that the basis for that count was an incident that victim testified occurred in June 2007, just after she had turned 15 years old . . . . On direct examination, victim had testified that defendant came into her bedroom, pulled her into her bathroom, pushed her against the counter, took her pants down, "and took his penis and rubbed it in [her] butt. And after that [she] remember[ed] him sticking it inside [her] vagina." []On cross-examination, however, victim had denied being raped during the June 2007 incident and explained that her direct testimony referred to a rape that occurred over her freshman year Winter Break. []The alleged Winter Break rape was the basis for counts 11 and 12, of which defendant was acquitted. []Victim testified that incident occurred "sometime during winter break" after the New Year when she was a freshman in high school. []On cross-examination, victim confirmed that the incident occurred shortly after January 1, 2007, during a two-

---

[1] This summary is presumed correct. Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

week break that had begun just before Christmas. []Even when confronted with hospital records showing defendant was hospitalized between December 26, 2006 and January 16, 2007, she insisted the incident took place in the first few days of 2007. []

In view of victim's contradictory accounts of the June 2007 incident, th[e] court concluded that the evidence supporting defendant's conviction on that count was not "sufficient to overcome the presumption of innocence and to meet the burden resting upon the prosecution to establish guilt beyond a reasonable doubt."

The convictions on counts 16 and 17 for dissuading a witness and possession of child pornography were not impacted by the errors. Accordingly, [the Court] directed the trial court on remand to enter a verdict of acquittal on count 13, enter verdicts of conviction on counts 16 and 17, and retry the assaultive counts. []

### *C*. *The Second Trial*

Defendant was retried in August and September 2013. He was retried on five counts of forcible lewd acts upon a child under age 14 . . . .

*1. Defense Motion to Admit Evidence of Victim's Testimony at the First Trial Regarding the Alleged Winter Break Rape and June 2007 Rape*

Before the second trial, defendant moved to admit evidence regarding the alleged Winter Break and June 2007 rapes to undermine victim's credibility. The prosecutor objected only to the admission of evidence that defendant was acquitted of those rapes, in part because defendant was being retried on former count 14, which charged the June 2007 incident as forcible lewd acts, rather than as rape. With respect to the admission of evidence of the two uncharged rapes, the prosecutor stated that victim "frankly will be testifying on direct about all of these incidents. And so I—you know, . . . he's not charged with anything from around Christmas time [i.e., the alleged Winter Break rape]. There's going to be some testimony about that. [¶] With respect to the [June 2007] event, he is charged with that event and there's going to be testimony about that." The court granted defendant's motion and prohibited the parties from mentioning the first trial or any convictions or acquittals.

*2. Victim*

Victim, who was 21 years old at the time of the second trial, testified that defendant, her step-father, began molesting her when she was 10 or 11 years old. The molestation was "random" in that a lot of time would pass between incidents. Victim testified about nine specific incidents that occurred in the home she shared with her mother, step-father, and two half-brothers.

The first molestation, when victim was 10 or 11 years old, occurred in the downstairs bathroom. Defendant pulled down victim's pants and rubbed his penis up and down her butt crack. Victim did not remember how the incident ended. On cross examination, she acknowledged that she told an investigator in 2008 that the incident ended when the front door opened. She acknowledged that "couldn't have happened because the front door was right by the downstairs bathroom." Victim explained that she told the investigator that the front door opening prompted the incident to end because she "was trying to find a reason for why it had ended" and that "seemed like the closest to the truth." The first incident was the basis for the count 1 charge of forcible lewd acts upon a child under age 14.

The second incident also occurred in the downstairs bathroom when victim was about 11 years old. Defendant pushed her against the wall, removed her pants and shirt, rubbed his penis around her vagina, and inserted it into her vagina. Victim put her clothes back on and tried to leave but defendant blocked her way. He then pushed her down, put his penis in her mouth, and moved his hips back and forth. Those events formed the basis for counts 2 through 5, which charged defendant with two counts of forcible lewd acts upon a child under age 14 and two counts of aggravated sexual assault upon a child under age 14.

The third incident victim recalled took place in the master bedroom when she was about 12 years old. She was wearing her mother's lingerie and defendant used a video camera to film himself penetrating her vagina with his fingers. In connection with that alleged conduct, defendant was charged with one count of forcible lewd acts upon a child under age 14 (count 8) and one count of aggravated sexual assault upon a child under age 14 (count 7).

The fourth incident, which occurred a few months after the third, also involved a video camera. Defendant and victim were in the master bathroom. Victim was up against the wall with her back to the defendant. He made her spread her legs apart and again filmed himself penetrating her vagina with his fingers. Victim conceded on cross examination that she had previously testified that her back was against the wall. She explained the discrepancy by saying that "[t]hese things happened a lot" and she had a hard time keeping the incidents straight. The fourth incident formed the basis for counts 9 and 10, which charged defendant with aggravated sexual assault upon a child under age 14 and forcible lewd acts upon a child under age 14, respectively.

The fifth incident victim recounted involved uncharged conduct. Victim testified that the defendant came into the bathroom while she was showering, pulled back the shower curtain, and took pictures of her.

Victim was approximately 14 years old at the time of the sixth incident--the Winter Break rape. "[A]round winter break," defendant took her into the upstairs bathroom and pushed her against the counter. From behind, he pulled down her pants and she felt his penis pressing into her vagina. When asked whether he penetrated her vagina victim responded, "I mean, I remember it hurting. So I think a little bit but I don't--" The prosecutor asked victim "did you used to believe that event had taken place a couple days after New Year's?" Defense counsel objected to the question as leading. After that objection was sustained, the following exchange took place between the prosecutor and victim:

"Q: At any time have you said that event took place a couple days after New Year's?
"A: Yes.

"Q: And do you still believe that event happened a couple days after New Year's?
"A: No.

"Q: And why is that?
"A: Because there were records that he was in the hospital. . . . In the last hearing they showed records . . . ."

Victim further explained, "I mean, I know it couldn't have taken place during that time now because he, like, there were records of him being in the hospital but I know that the event happened. I just--it just must have happened at a different

4

time." Defendant was not charged in the second trial in connection with the alleged Winter Break rape.

On cross-examination, defense counsel confronted victim with her testimony at the first trial--which was referred to as a "prior hearing" at the second trial--that the rape occurred a few days into 2007. She responded that she "had been mistaken about the time it had taken place." She claimed not to recall insisting in the prior proceeding that the rape had taken place shortly after New Years even after being shown hospital records indicating the defendant was in the hospital at that time.

Victim next testified to a seventh incident that occurred in June 2007 when she was 15 years old. Defendant came into her bedroom and grabbed her. She tried to resist but he overpowered her and pushed her against the counter in the upstairs bathroom. He covered her eyes, pulled her pants down, and put his penis in her vagina. On cross examination, defense counsel confronted victim with her testimony about the June 2007 incident at the first trial when she said on direct that she was raped but then denied it on cross-examination. Victim explained that on cross-examination in the prior proceeding she was confused and thought defense counsel was asking about a different incident. The seventh incident was the basis for count 11 (former count 14), charging defendant with forcible lewd acts upon a child aged 14 or 15.

The victim testified about an eighth incident, alleging defendant made her orally copulate him in the master bedroom. When she said she did not want to perform the act he offered to dip his penis in juice to make it taste better. He then put his penis in her mouth. Victim could not remember when the eighth incident occurred. She acknowledged on cross-examination that she had not mentioned the detail about defendant's offer to dip his penis in juice at the prior hearing or to investigators. The oral copulation was charged in count 6.

Lastly, victim testified that when she was 11 or 12 years old defendant was helping her assemble a bed in her bedroom. He pulled down her pajama pants and snapped a picture with his cell phone. Victim heard her mother and defendant fighting about the photo the following day. Defendant said a friend had sent it to him. Victim's mother asked victim if the photo depicted her. Afraid to tell the truth because defendant was present and looked angry, victim said no. Defendant was not charged in connection with that incident.

Victim testified that she never told her mother about the molestation because she worried her mother would get angry or disbelieve her. She did not tell her father, with whom she lived half the time, because she feared hurting or disappointing him. The first person victim confided in about the abuse was her best friend, Tori. Victim first told Tori about the abuse when they were both in the eighth grade. Victim could not recall the specifics of those conversations other than that Tori urged victim to report the abuse to an authority figure.

When victim was a freshman or sophomore in high school the guardian of her friend, Jessica, called victim's father and informed him that victim might have been abused by defendant. Victim's father discussed the call with victim and she "told him it had only happened once" and not to tell her mother. Victim falsely told Tori that her father was not going to do anything about the abuse because "money was tight and . . . it would be hard without the financial help from my mom." Victim testified she did not lie to Tori; her father had mentioned money issues in a prior conversation and she "used it as an excuse not to have to tell [Tori] that [she, victim,] wasn't ready to tell anyone still."

*3. Tori*

Tori, victim's best friend in the eighth grade and high school, testified that victim first told her defendant was "do[ing] things" to her in the summer of 2006, following their graduation from eighth grade. According to Tori, in that first conversation, victim told her defendant had made her orally copulate him and had rubbed his penis along her butt crack. Between summer 2006 and the end of 2007, Tori and victim discussed the abuse often. Tori recalled victim saying defendant would try to come in while she was in the shower and would put his hand up her shirt or skirt. At some point victim also told Tori the defendant had put his penis in her vagina.

Tori urged victim to tell someone about the molestation but victim said she did not want to and told Tori not to tell her mother. Tori initially respected victim's wishes, but eventually told her mother that victim was being abused. She could not recall which details she told her mother and which she withheld.

*4. Roxanne Clair*

Tori's mother, Roxanne Clair, testified that in early 2007 Tori disclosed that she was concerned about victim and implied that victim was being sexually abused by defendant. Tori "mentioned things like [defendant] watching [victim] take a shower or pictures that he took when she was younger." Clair never knew about "specific acts" of sexual abuse. Clair understood from Tori that victim did not want to talk about the situation, did not want her mother to find out, and would deny the accusations if anyone asked her about them. Clair contacted Child Protective Services to report her concerns about victim in February 2008.

*5. Krissi Durant*

Krissi Durant testified that in 2008 she was a sexual assault detective with the Santa Cruz County Sheriff's Office. On Friday, February 8, 2008, a Child Protective Services social worker informed Durant about allegations of defendant's sexual abuse of victim. At noon that day, Durant went to victim's high school to interview her. School administrators called victim out of class and Durant spoke with her in a private office at the school. After Durant introduced herself and said she was there to discuss information child protective services had received, victim began crying. During the interview victim cried a lot and was short with her answers.

Victim made a pretext call to defendant the following Tuesday. She called from the sheriff's office using her cell phone. Durant recorded the call, which was played for the jury.

Victim began the call by telling defendant she had been talking to her school counselor about "stuff going on at home that [she] didn't like," but that she had not told the counselor about defendant "touching" her. Defendant responded "Was I drunk or something? I mean that wasn't me. Are you sure? I mean, what about your dad?" Victim then asked, "what about the pictures you took like when you picked the lock, and I was in the shower, and you came in with a camera and

6

started taking pictures?" Defendant initially denied doing so, saying "No," "I don't remember that," and "I would never do that." Victim insisted defendant remembered but was denying it and he responded, "Well . . . even if, I mean, I didn't deny it, if I said so, I would go to jail. Do you understand? If I said so on the phone, you know what I mean?"

Victim asked defendant "why" and he responded "maybe you remind me of your mom. . . . I couldn't tell you why, I mean, other than maybe I'm sick and need just to not do drugs. . . . I mean, maybe I mis-used my affection for you. You know, showed my love the wrong way." Later, defendant continued, "if, you know, you say this to people, and if you have to, you have to. You know what I mean? But I'll go to jail, and the marriage is over, and my life is over, and I won"t be able to see my kids again. But I need to do whatever it takes to make, you know, things right with you." When victim again pressed defendant to explain "why" he said "I don't know. You were a pretty little girl. I don't know. I mean, you know, I took affection I needed from you. I don't know. Because I know you loved me. I don't know. You know what I mean? I mean maybe because I didn't think you would tell."

Victim asked defendant to "promise me like you'll never touch me again" he responded "I--I promise, never ever ever. I'm not--I won't even give you a hug unless you want me to. You are safe, and I swear I'm gonna look at not doing drugs and whatever it takes. I mean, I--I'm probably in denial about the whole thing then." Defendant mentioned being in denial two other times during the call saying "you know, it's so horrible I must be in denial about it. I mean, I remember playing with you. You know what I mean? But . . ." and "I'm sure it was misguided affection. Sick. I'm sorry. There's . . . I'm sure I'm in denial. I mean, you know what though? You have nothing to worry about from me. Do you believe that?"

Victim also asked defendant why he would "want to touch [her] and like have sex with [her] and stuff" when she was so young. Defendant answered: "I don't, I don't know . . . . Like I said, it must be some mental problem I have. I mean no one, no one has ever, you know, touched you, right?" Victim responded "No."

Victim asked defendant "Do you still have those videos that you took when I was in mom's lingerie?" "No. No. No way," said defendant, "I probably erased them or destroyed them, or I have the tape in the room. I'll go over them to make sure. I mean, your mom looks at those tapes too. I mean, if there's something on there, I better find it." He also told victim he never showed pictures to anyone or put them on the Internet.

Officer Durant reached defendant on his cell phone in the evening following the pretext call. Defendant met her at the sheriff's office that night, at which point he was arrested. Defendant did not have his cell phone with him at the time of his arrest and it never was recovered.

Officer Durant interviewed Tori in April 2008. At that time, Tori stated victim

had said defendant took pictures of her in the shower and videotaped her while she was wearing her mom's lingerie. Tori said nothing about defendant raping victim or rubbing his penis against her backside.

*6. Search Warrant*

Todd Phillips, who was a deputy sheriff in Santa Cruz County in February 2008, testified that he and other officers served a warrant to search defendant's residence on the afternoon of February 12, 2008, a few hours after the pretext call took place. Officers seized lingerie, digital cameras, video cameras, computers, videotapes, undeveloped camera film, DVDs, and CDs from the home.

Ervin Heartsner, a retired police officer who performs computer forensics work for the Santa Cruz County Sheriff''s Office, testified that he examined defendant's computer, which was seized during the search. He found pictures and videos of victim's mother (defendant's wife) in which she was nude or partially clothed. In some images she was engaged in sex acts, including oral copulation, vaginal intercourse, and digital penetration. Where she was engaged in sex acts with a man, the man appeared to be the one filming or taking the pictures and his face was not visible. Heartsner also found pornographic images on the computer. Some depicted adult women, some depicted children. He did not find any images depicting molestation or abuse of victim.

*7. Victim's Mother*

Victim's mother testified that she once saw a picture on defendant's cell phone showing a woman from the waist to the mid-thigh. The woman was naked, although flannel pants were visible in the picture. Victim was about 14 years old at the time. Thinking it was a picture of victim because the flannel pants resembled victim's pajamas, victim's mother confronted defendant in the master bedroom. He denied the picture was of victim, saying a friend had sent it to him. Victim's mother then went to victim's room and asked if defendant had ever taken a picture of her. She said he had not.

**D**. **Verdict and Sentencing**

On September 10, 2013, the court granted defendant's motion for acquittal of the forcible rape charged in count 12 (former count 15) for insufficient evidence. (§ 1118.1.). The jury deliberated for three full days. On September 18, 2013, jurors found defendant guilty of counts 8 and 10, which charged two counts of forcible lewd acts upon a child under age 14 and were based on two incidents in which defendant videoed himself digitally penetrating victim. The jury was unable to reach verdicts on the other charges. Therefore, the court declared a mistrial as to counts 1 through 7, 9, and 11. The court sentenced appellant to a term of 18 years eight months. . . .

**E. Contempt**

During the trial, the court issued an order to show cause to the prosecutor,

Assistant District Attorney Ross Taylor, as to why he should not be held in contempt for comments he made to the court outside the presence of the jury. The order to show cause was based on the following exchange:

"THE COURT: Mr. Taylor, your obvious disdain for selected rulings of the Court is totally unprofessional. The way you push back, and it's been almost from the very beginning of the case. And, you know--
"MR. TAYLOR: Are you serious?
"THE COURT: Yes, I am totally serious. It's not a good time to engage me in argument about it--
"MR. TAYLOR: Ya, well, you know--
"THE COURT: Mr. Taylor, because I'm not going to listen to you. And you are increasing my ire--
"MR. TAYLOR: I'm not interested in what you have to say. I don't know if I could be any less interested. Some of the rulings that you've made are just outrageous, Your Honor. . . ."

Following a December 20, 2013 hearing, the court issued an order and judgment of contempt. In doing so, the court characterized the exchange above as "the culmination of a continuum of insolent and inappropriate behavior by [the prosecutor] that occurred throughout the trial." The court ordered the prosecutor to pay a $250 fine.

People v. Poletti, 240 Cal. App. 4th 1191, 1196-1204 (2015), review denied (Jan. 20, 2016).

## III. DISCUSSION

### A. Standard of Review

This Court may entertain a petition for a writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A petition for a writ of habeas corpus is governed by AEDPA deference, under which a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state courts' adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. The petitioner bears the burden of showing objective unreasonableness. Cullen v. Pinholster, 563 U.S. 170 (2011); Harrington v. Richter, 562 U.S. 86, 103, (2011)).

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Petitioner also must show actual prejudice from the error, that is, that the error had a substantial and injurious effect or influence in determining the jury's verdict, before the court may grant federal habeas relief. Calderon v. Coleman, 525 U.S. 141, 146 (1998) (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991). Here, the California Supreme Court denied review. Thus, the last reasoned state court decision is that of the Court of Appeal.

**B.    CLAIMS**

Petitioner asserts the following grounds for relief: (1) prosecutorial misconduct, (2) a

Brady violation, (3) failure to admit into evidence prior acquittals, and (4) cumulative prejudice.

### 1.    Prosecutorial Misconduct

#### a.    Legal Standard

A defendant's due process rights are violated when a prosecutor's misconduct renders a

trial "fundamentally unfair."  Darden v. Wainwright, 477 U.S. 168, 181 (1986); Smith v. Phillips,

455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged

prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.").  Under

Darden, the first issue is whether the prosecutor's remarks were improper; if so, the next question

is whether such conduct infected the trial with unfairness.  Tan v. Runnels, 413 F.3d 1101, 1112

(9th Cir. 2005); see also Deck v. Jenkins, 814 F.3d 954, 978 (9th Cir. 2016) (recognizing that

Darden is the clearly established federal law regarding a prosecutor's improper comments for

AEDPA review purposes).  A prosecutorial misconduct claim is decided "'on the merits,

examining the entire proceedings to determine whether the prosecutor's remarks so infected the

trial with unfairness as to make the resulting conviction a denial of due process.'"  Johnson v.

Sublett, 63 F.3d 926, 929 (9th Cir. 1995).

Factors which a court may take into account in determining whether misconduct rises to a

level of due process violation are: (1) the weight of the evidence of guilt, see United States v.

Young, 470 U.S. 1, 19 (1985);  (2) whether the misconduct was isolated or part of an ongoing

pattern, see Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct

relates to a critical part of the case, see Giglio v. United States, 405 U.S. 150, 154 (1972) (failure

to disclose information showing potential bias of witness especially significant because

governments case rested on credibility of that witness); and (4) whether a prosecutor's comment

misstates or manipulates the evidence, see Darden, 477 U.S. at 182.

"A prosecutor's . . . intemperate behavior violates the federal Constitution only when it

comprises a pattern of conduct so egregious that it infects the trial with such unfairness as to make

the conviction a denial of due process."  Olivero v. Foulk, No. CV 14-2275-CAS JEM, 2015 WL

366031, at *5 (C.D. Cal. Jan. 27, 2015) (quoting (People v. Navarette, 30 Cal.4th 458, 506 (2003)) (ellipsis in original); People v. Ayala, 23 Cal. 4th 225, 283–84, 1 P.3d 3, 39 (2000) (same). Improper questioning of a witness by the prosecutor is not alone sufficient to warrant reversal. Rather, the relevant inquiry on habeas is that dictated by Darden, 477 U.S. at 181, i.e., whether the prosecutor's behavior so infected the trial with unfairness as to make the resulting conviction a denial of due process. See Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998). In considering whether the questioning deprived the defendant of a fair trial, the witness's testimony should be viewed as a whole to determine the impact of the improper questioning. See id. at 934-35.

### b.     Analysis

Petitioner's prosecutorial misconduct claims consists of two main claims: (1) the prosecutor exhibited rude and intemperate behavior, and (2) the prosecutor improperly engaged in improper questioning about the resources the Petitioner expended on his defense.[2] The trial court and Court of Appeal both specifically reprimanded Taylor for this conduct, including in front of the jury. ECF No. 1 at 61. For example, the trial court admonished "you've been spending a lot of time pouting about my ruling and it's rather unprofessional," and "your obvious disdain for selected rulings of the Court is totally unprofessional." Id. at 61, 65. The trial court held the prosecutor in contempt for his behavior and fined him, and the Court of Appeal reported him to the state bar. Id. at 20. The Court of Appeal reasoned:

> On cross-examination, the investigator testified that he had spent approximately 80 hours searching for one defense witness, Aaron Allen, and that he charged $225 per hour. Prosecutor Ross Taylor then questioned the investigator as follows:
>
> MR. TAYLOR: You spent time looking for Tori; correct?
> INVESTIGATOR: Yes.

---

[2] Petitioner notes in passing that the prosecutorial misconduct includes other matters, such as a refusal to restrict his opening statement to the proper bounds, and a violation of an in limine order suppressing the child pornography convictions from the first trial. ECF No. 1 at 60. These arguments are unsupported in Petitioner's petition and were not exhausted as Petitioner failed to argue them before the Court of Appeal. 28 U.S.C. § 2254(b), (c); Rose v. Lundy, 455 U.S. 509, 515-16 (1982) (holding that habeas petitioners must present to the highest the court a fair opportunity to rule on the merits of each and every claim); ECF No. 10-29 at 77-78. Accordingly, the Court declines to consider these arguments.

United States District Court
Northern District of California

MR. LEVINE: Your Honor, this is irrelevant.
THE COURT: Sustained.

MR. TAYLOR: You spent time attempting to locate Olivia Freedman?
MR. LEVINE: Irrelevant.
THE COURT: Sustained.

Q: You interviewed Garret Olson?
MR. LEVINE: Your Honor, this is—
COURT: Sustained.
MR. LEVINE: Give the instruction not to continue this.
THE COURT: We're concerned with the interview Aaron Allen. Confine ourselves to that.

MR. TAYLOR: So how much of the time you spent in connection with this case is the 80 hours that you have described?
MR. LEVINE: Objection. Irrelevant.
THE COURT: Sustained.

'The deliberate asking of questions calling for inadmissible and prejudicial answers is misconduct.' " [] "Such misconduct is exacerbated if the prosecutor continues to attempt to elicit such evidence after defense counsel has objected." []

Well before the fourth sustained objection, "it should have been apparent to the prosecutor that" the trial court would not permit questions about time spent investigating witnesses other than Aaron Allen. [] By continuing to pursue that line of questioning, the prosecutor appears to have "engaged in a deliberate attempt to put inadmissible and prejudicial evidence before the jury." [] Accordingly, we agree with defendant that the prosecutor committed misconduct.

However, defendant has not shown the misconduct resulted in prejudice. "Generally, there is no prejudice where an objection is made and sustained[] "Because the trial court sustained each objection, no inadmissible testimony was heard by the jury." [] And even if the prosecutor's questions alone implied to the jury that defendant spent significant sums on his defense, that was apparent from the investigator's testimony regarding his fees and the time he spent searching for Allen, which was elicited without objection. Accordingly, "the consequences of the improper questions fell far short of 'infect[ing] the trial with such unfairness as to render the subsequent conviction a denial of due process[], and there is no reasonable probability they influenced the verdict." []

We agree that the prosecutor, Ross Taylor, behaved poorly and is deserving of rebuke. . . . Taylor's conduct, however, did not infuse the trial with such unfairness that defendant's conviction constitutes a denial of due process. Assuming his conduct constituted a deceptive or reprehensible method to persuade the jury, we review the claims of misconduct under state law, asking whether it is reasonably probable the jury would have reached a different result in the absence of the prosecutor's misconduct. [] Defendant argues the prosecutor's conduct made it appear that defense counsel and the court were allied against the prosecutor. We think it is more likely the prosecutor's "insolent and inappropriate" behavior alienated the jury, rather than garnering their sympathy.

Our conclusion finds support in the verdict. Of the 12 counts on which defendant was tried, the jury convicted him of just two, both of which involved conduct he appeared to admit to in the pretext call. The verdict, and the evidence supporting

the convictions, convince us it is not reasonably probable the prosecutor's misconduct affected the trial's outcome.

Poletti, 240 Cal. App. 4th at 1213-17.

In sum, the Court of Appeal found that Taylor did commit prosecutorial misconduct under state law, both for his rude and intemperate behavior and for his improper questioning on the amount Petitioner expended on his defense. The Court of Appeal, however, found that Petitioner was not prejudiced by this misconduct.

At the outset, Petitioner argues that AEDPA deference does not apply because under Taylor v. Maddox, 366 F.3d 992 (9th Cir. 2004), federal courts review de novo a habeas petition when the state court ignored evidence or facts. Id. at 68. Petitioner is in error. Taylor v. Maddox stands for the proposition that when a state court makes factual findings erroneously, for example by failing to hold a hearing, plainly misstating the record in a manner central to the petitioner's case, or ignoring evidence before it which supports the petitioner's claim, the habeas court should review the factual determination de novo. 366 F.3d at 1001. Here, Petitioner argues only that the Court of Appeal ignored general concepts such as Sarah's lack of credibility, the absence of overwhelming evidence of guilt, "a prosecutor's influence on a jury," the misconduct's influence on the defense, the pervasiveness of the misconduct, the nature of sexual-offense trials involving a minor victim, the prosecutor's non-verbal misconduct, the nature of the misconduct, and the deliberateness of the misconduct. ECF No. 1 at 69-79. None of these general propositions are factual, evidentiary determinations made in the kind of "fact finding process" to which Maddox applies.

Petitioner argues that this Court should extend the Taylor v. Maddox doctrine from evidentiary factual findings to determinations of prosecutorial misconduct. Id. at 68 n.19. Petitioner argues, in a footnote, that it is "logical" to extend the doctrine because prosecutorial misconduct is "a mixed question of fact and law." ECF No. 1 at 68 (citing Brown v. Borg, 951 F.2d 1011, 1014 (9th Cir. 1991); Strickland v. Washington, 466 U.S. 668, 698 (1984)). The Court declines the invitation. The Court will apply ordinary AEDPA deference in reviewing the Court of Appeals' decision on prosecutorial misconduct in the form of Ross Taylor's rude and intemperate behavior and inappropriate questioning.

As to the Court of Appeal's determination that the prosecutorial misconduct was not prejudicial, Petitioner argues that "[n]o fairminded jurist could agree" because the rude and intemperate behavior more likely "alienated the jury, rather than garnering their sympathy." ECF No. 1 at 79-80. Petitioner argues instead that the questioning regarding the amount of money Petitioner spent on his defense likely distracted and inflamed the jury and that the intemperate argumentativeness "created the false impression that the state was being denied a fair trial." Id. at 79, 82. Respondent, for his part, agrees with the Court of Appeals' conclusion that the prosecutor's misconduct likely turned the jury against him. ECF No. 8-1 at 16-17.

Petitioner has not shown that the Court of Appeal made either an error contrary to clear federal law or an unreasonable determination of that law. No doubt, Taylor's behavior was unquestionably poor. A prosecutor is an officer of the court tasked with protecting "the integrity of the court and the criminal justice system," and Taylor certainly did not do so here. Northern Mariana Islands v. Bowie, 243 F.3d 1109, 1122 (9th Cir. 2001). But the Court of Appeal's conclusion that Taylor's behavior more likely hurt the prosecution rather than helped it comports with common sense. As the Court of Appeal noted, the jury convicted Petitioner only of the two counts that were supported by admissions Petitioner made during the pretext phone call, but failed to convict on the remaining counts. Certainly this Court cannot conclude that the "prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process." Sublett, 63 F.3d at 929 (quoting Hall v. Whitley, 935 F.2d 164, 165 (9th Cir.1991)).

### 2. Brady Violation

#### a. Standards

In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. For a Brady claim to succeed, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Banks v. Dretke, 540 U.S. 668, 691 (2004) (quoting Strickler v. Greene, 527

U.S. 263, 281-82 (1999)).[6] The Supreme Court has made clear that the duty to disclose such evidence applies even when there has been no request by the accused. <u>United States v. Agurs</u>, 427 U.S. 97, 107 (1976).

Evidence is "favorable" if it is impeaching or exculpatory. <u>Comstock v. Humphries</u>, 786 F.3d 701, 708 (9th Cir. 2015) (citing <u>Strickler</u>, 527 U.S. at 281-82). That evidence may have minimal value is not relevant to the determination of whether it is favorable. <u>Comstock</u>, 786 F.3d at 708 (concluding that the state court's finding that a statement's impeachment value was "minimal" was "contrary to" <u>Brady</u>). "<u>Brady</u> information includes 'material . . . that bears on the credibility of a significant witness in the case.'" <u>United States v. Brumel-Alvarez</u>, 991 F.2d 1452, 1461 (9th Cir. 1993) (quoting <u>United States v. Strifler</u>, 851 F.2d 1197, 1201 (9th Cir. 1988)).

Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Cone v. Bell</u>, 556 U.S. 449, 469-70 (2009). "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine confidence in the outcome of the trial.'" <u>Smith v. Cain</u>, 132 S. Ct. 627, 630 (2012) (quoting <u>Kales v. Whitley</u>, 514 U.S. 419, 434 (1995)); <u>see also</u> <u>United States v. Rodriguez</u>, 766 F.3d 970, 988 (9th Cir. 2014) (nondisclosure that prosecution witness was government informant did not violate <u>Brady</u> because witness's credibility already undermined by other impeachment evidence).

"Evidence relevant to the impeachment of a witness adverse to the defendant may be favorable and material when the reliability of the witness may be determinative of the defendant's guilt or innocence." <u>United States v. Collins</u>, 551 F.3d 914, 924 (9th Cir. 2009) (internal quotation marks omitted); <u>Belmontes v. Brown</u>, 414 F.3d 1094, 1114-15 (9th Cir. 2005), <u>rev'd on other grounds</u>, 549 U.S. 7 (2007) (undisclosed impeachment evidence was not material where witness had already been powerfully impeached, where the jury was instructed to consider witness's testimony skeptically, and where witness's testimony was corroborated by disinterested

---

[6] For the purpose of <u>Brady</u>, the terms "material" and "prejudicial" have the same meaning. <u>United States v. Kohring</u>, 637 F.3d 895, 902 n.1 (9th Cir. 2011).

16

United States District Court
Northern District of California

witnesses).  "Impeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case."  United States v. Price, 566 F.3d 900, 913-14 (9th Cir. 2009) (quoting Silva v. Brown, 416 F.3d 980, 987 (9th Cir. 2005)) (finding Brady violation for the prosecution's failure to disclose evidence of a key witness' criminal history of dishonest and fraudulent conduct).  That the defense already has some evidence with which to impeach a prosecution witness does not excuse the prosecution from disclosing further impeachment evidence that "would provide the defense with a new and different ground of impeachment."  Silva, 416 F.3d at 989-90 (citation omitted).  Where the undisclosed impeachment evidence would have provided no independent basis for impeaching the witness separate from evidence already known to and utilized by the defense, however, no Brady violation will be found. United States v. Kohring, 637 F.3d 895, 908 (9th Cir. 2011).

### b.    Analysis

Petitioner's Brady claim is based upon the fact that Sarah changed her testimony as to when a rape occurred between the first and second trials, the prosecutor knew about this change, and the prosecutor failed to disclose that evidence with the defense.  ECF No. 1 at 82-83.  The trial court and Court of Appeal both concluded that the prosecutor knew about but failed to disclose this evidence.  Id. at 83.  The Court of Appeal summarized and reasoned as follows:

> Defendant contends the prosecution committed misconduct by failing to disclose material it was required to provide to the defense under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) and section 1054.1 . . . . As discussed above, at the first trial victim was adamant the Winter Break rape took place in the early days of 2007, even when confronted with records showing defendant was in the hospital at that time. At the second trial, the prosecutor's first question to victim about the timing of the Winter Break rape was "did you used to believe [the Winter Break rape] had taken place a couple days after New Year's?" Victim explained that she did used to hold that belief, that she no longer did so because of the hospital records, and that the rape must have occurred at another time. On cross examination, victim testified that she told the prosecutor prior to taking the stand that she no longer believed the Winter Break rape occurred while defendant was hospitalized.
>
> Outside the presence of the jury, the prosecutor represented to the court that victim never made any statements to him that required disclosure. He stated that in his pretrial conversation with victim he merely told her she would "need to explain" the timing of the Winter Break rape. The trial court credited the prosecutor and found no discovery violation.
>
> The phrasing of the prosecutor's question – did you *used to* believe [the Winter Break rape] had taken place a couple days after New Year's – strongly supports

the conclusion that he was aware victim planned to change her testimony. (Italics added.) How else would he know the belief she adhered to at the first trial was one she "used to," but no longer, held? Nevertheless, we conclude that there was no *Brady* violation because victim's statement that the Winter Break rape did not occur when defendant was in the hospital was not favorable to his case. Accordingly, it "did not fall within the scope of *Brady*." . . . While we do find there was a section 1054.1 violation, defendant does not demonstrate prejudice. A section 1054.1 violation is prejudicial "and thus is a basis for reversal only where it is reasonably probable, by state-law standards, that the omission affected the trial result[.]"

The question, then, is whether it is reasonably probable that a result more favorable to defendant would have been reached absent that evidence. We think not. Apart from the Winter Break rape, the jury heard victim testify about eight incidents of sexual abuse, including two other times defendant put his penis in her vagina and two forced oral copulations. Thus, the Winter Break rape testimony was no more inflammatory than victim's other testimony, reducing the likelihood its admission was prejudicial. Moreover, jurors did not convict defendant of the charges to which the Winter Break rape evidence most closely pertained – namely, counts 2 and 3, which charged defendant in connection with allegedly inserting his penis into victim's vagina in the downstairs bathroom, and count 11 (former count 14), charging defendant in connection with the alleged June 2007 rape. This verdict convinces us that the jury's decision to convict defendant on counts 8 and 10 was not influenced by the Winter Break rape evidence.

Furthermore, the admission of evidence of the uncharged Winter Break rape assisted defendant by enabling him to impeach victim with her prior inconsistent testimony. For all of these reasons, no reasonable probability exists that, had the Winter Break rape evidence been excluded, the result would have been more favorable to defendant.

<u>Poletti</u>, 240 Cal. App. 4th at 1209-1212. The Court of Appeal, in sum, found error under state law, but not <u>Brady</u>, and found no prejudice under state law.

The Court of Appeal's ultimate conclusion was neither contrary to clear federal law nor objectively unreasonable. First, the Court of Appeal determined that the prosecutor suppressed evidence because it was clear from his question – "did you *used to* believe" that the Winter Break rape occurred after New Year's – that he knew Sarah's story had changed. <u>Id.</u> at 1211. This Court agrees with that conclusion. "Evidence is suppressed where it is known to the State and not disclosed to the defendant." <u>Comstock</u>, 786 F.3d at 709. The duty to disclose evidence applies even when there has been no request by the accused, and here, Petitioner's defense counsel even requested the suppressed evidence. <u>Agurs</u>, 427 U.S. at 107 (1976); ECF No. 1 at 83. [3]

_____

[3] The Court also notes that the prosecutor misrepresented his failure to disclose before the trial court. After the alleged <u>Brady</u> evidence came out during Sarah's testimony, Sarah averred that she had told the prosecutor about the changed story before she took the stand. ECF No. 10-12 at 33. Nonetheless, the prosecutor later stated "I don't have any new or different statements to disclose.

18

Turning to the second element, the Court of Appeal's determination that the suppressed evidence was not favorable to Poletti was contrary to clearly established law. That court erred in focusing on the substance of Sarah G's testimony at the second trial, instead of the fact that the testimony had changed. Respondent here makes the same error. See ECF No. 8-1 ("[T]he change in story undermined the defense strategy, was not impeaching, and was not favorable to the defense.") While the *new testimony itself* might not have been favorable to Poletti, *the fact that the testimony had changed* clearly was favorable, because the fact of the change could be used to impeach Sarah G's testimony and suggest that her testimony was fabricated. "[I]mpeachment evidence, like exculpatory evidence, plainly constitutes evidence that is favorable to the accused under Brady's first prong." Shelton v. Marshall, 796 F.3d 1075, 1084 (9th Cir.), amended on reh'g, 806 F.3d 1011 (9th Cir. 2015) (citing United States v. Bagley, 473 U.S. 667, 676 (1985) ("Impeachment evidence . . . as well as exculpatory evidence, falls within the Brady rule. Such evidence is 'evidence favorable to an accused . . . .'" (citations omitted in original) (ellipses in original)). See also Banks, 540 U.S. at 691-93 (2004) ("Farr's paid informant status, qualifies as evidence advantageous to Banks."); Strickler , 527 U.S. at 280 ("We have . . . held that the duty to disclose . . . encompasses impeachment evidence as well as exculpatory evidence." (citation omitted)).[4]

---

Simple as that." ECF No 10-20 at 70-71. The Court questioned "I'm expecting you to respond as an officer of the court . . . . No further information provided?" Id. The prosecutor responded "definitely." Id. The trial court later concluded that the prosecutor failed to disclose evidence, and misrepresented this to the court. ECF No. 1-27 at 17; Poletti, 240 Cal. App. 4th at 1216 (noting "At the posttrial contempt hearing, the trial court stated 'it appears to me now in hindsight having conducted the entire trial, that [victim] had in fact informed [the prosecutor] prior to her testimony that . . . her view . . . about the winter break rape allegation had changed.'").

[4] Petitioner also argues that if the prosecutor had disclosed the evidence, the defense would not have sought to introduce the winter break rape at all. ECF No. 1 at 92-93. Evidence which merely affects a defense's strategic choices but is neither exculpatory nor impeaching is not favorable evidence for the purposes of Brady. Banks v. Dretke, 540 U.S. 668, 691 (2004). Even if the Court were to consider this argument as an instance of prosecutorial misconduct other than a Brady violation, the effect of any misconduct was not prejudicial. The trial actually preceded as follows: the defense introduced the winter break rape into evidence, was not allowed to introduce acquittal evidence, and had only weak evidence of impeachment (that Sarah was mistaken about the rape rather than lying). Were the evidence disclosed, defense counsel would not have introduced the winter break rape, and as result would have no impeachment evidence regarding the winter break rape. On balance it is difficult for the Court to assess which of these two scenarios would make it more likely that Petitioner would be convicted, which falls far short of the

Petitioner's claim nonetheless fails, however, because he has not demonstrated prejudice. The evidence ultimately came out at trial, and therefore any impeachment value was available to – and indeed used in cross examination by – defense counsel. ECF No. 10-13 at 33-35. Delay in disclosure does not deprive an accused of due process where disclosure during trial, though tardy, is still of value to the accused, see United States v. Vgeri, 51 F.3d 876, 880 (9th Cir. 1995) (concluding that a delayed disclosure was not untimely because it was disclosed during trial, and the defense was still able to cross examine the relevant witness); United States v. Browne, 829 F.2d 760, 765 (9th Cir. 1987), cert. denied, 485 U.S. 991 (1988). Due process requires only the disclosure of exculpatory material in sufficient time to permit defendant to make effective use of the material. See LaMere v. Risley, 827 F.2d 622, 625 (9th Cir. 1987). Even petitioner acknowledges that the "[j]ury learned of the changed story and petitioner was able to wield it at trial." ECF No. 1 at 92-93.

In sum, the Court of Appeal did not err in concluding there was no Brady violation.

### 3. Failure to admit into evidence prior acquittals

#### a. Legal Standard

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. See Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999); Colley v. Sumner, 784 F.2d 984, 990 (9th Cir.), cert. denied, 479 U.S. 839 (1986). The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Supreme Court precedent under § 2254(d)). Failure to comply with state rules of evidence is neither a necessary nor a

---

prejudice standard for prosecutorial misconduct claims raised on habeas. Calderon v. Coleman, 525 U.S. 141, 146 (1998) (requiring a showing that the error had a substantial and injurious effect or influence in determining the jury's verdict).

sufficient basis for granting federal habeas relief on due process grounds. See Henry, 197 F.3d at 1031; Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991); see also Montana v. Egelhoff, 518 U.S. 37, 42 (1996) (holding that due process does not guarantee a defendant the right to present all relevant evidence).

### b.    Analysis

Petitioner argues that the trial court committed constitutional error  when "[i]n lieu of ensuring that the jury was informed of the acquittals, . . . the trial court gave a limiting instruction that, in material part, limited the jury's consideration of the allegations of uncharged rapes to its evaluation of Sarah's credibility."  ECF No. 1 at 28.  The Court of Appeal reasoned:

> Towards the end of the trial, defendant requested the jury be instructed that he was acquitted of the uncharged Winter Break and June 2007 rapes. Defense counsel argued that victim's testimony on direct examination regarding those incidents was akin to Evidence Code section 1108 propensity evidence. The court denied defendant's request, reasoning a limiting instruction would prohibit the jury from using the testimony regarding uncharged rapes as propensity evidence.

> The court instructed the jury as follows: "The defense presented evidence concerning [victim]'s allegations that the defendant committed two forcible rapes, the first involving the 'Winter Break' incident and the second involving the alleged June of 2007 incident. Neither allegation is charged in this case as forcible rape. [] The sole purpose for which evidence of the Winter Break incident was presented, and the sole purpose for which you may consider it, is a[s] it pertains to the credibility of [victim] with regard to her testimony as to the offenses with which defendant is charged. Do not consider the evidence as it relates to the Winter Break forcible rape allegation for any other purpose. [] You may consider the evidence concerning the alleged incident in June of 2007 for the purposes of determining whether the People have proven defendant's guilt beyond a reasonable doubt as to the charge of a lewd act upon a child who was 14 or 15 years old as alleged in count 11 and for the purpose of evaluating [victim]'s credibility as it relates to the charged offenses. You may not consider this evidence for any other purposes."

> At issue in this appeal is whether the Griffin rule applies where evidence of uncharged sex crimes is admitted for the limited purpose of assessing victim's credibility.  We need not decide that question, however. Even assuming the court erred in refusing to inform the jury about defendant's acquittals, that assumed error did not prejudice defendant. . . .

> Defendant was convicted of two counts of violating section 288, subdivision (b). The elements of an offense under that provision are: (1) physical touching of a child under age 14; (2) for the present and immediate purpose of sexually arousing or gratifying the defendant or victim; and (3) the touching was accomplished by use of force, violence, duress, menace, or fear of injury. []

> There was evidence corroborating victim's testimony that defendant videotaped her both in the master bedroom while she was wearing her mother's lingerie and a

few months later when she was in the bathroom. Specifically, defendant appears to admit such conduct during the pretext call; Officer Durant testified that Tori told her that victim described such conduct; and lingerie and video equipment were found in the home. The pretext call also corroborated victim's testimony that defendant touched her sexually during those incidents. On that call, defendant said he had "showed [victim his] love the wrong way." He offered a number of possible reasons for doing so: "[she] remind[ed him] of [her] mom"; "[he's] sick"; "[she was] a pretty little girl"; he needed "affection"; and he "didn't think [she] would tell." He also said that if she told people he would "go to jail" and never "see [his] kids again." Taken together, these statements strongly suggest defendant touched victim for the present and immediate purpose of sexually arousing himself, and thus support victim's testimony that defendant digitally penetrated her during the videotaping incidents.

No evidence was introduced to substantiate victim's testimony as to the final element of counts 8 and 10, the use of force, violence, duress, menace, or fear of injury during the incidents. Thus, to convict defendant on counts 8 and 10, jurors had to credit victim's testimony on that point. The question for us, then, is whether it is reasonably probable that at least one juror would not have done so had they learned defendant had been acquitted of the uncharged rapes. [] And, we embark on that inquiry guided by the fact that the acquittals are only slightly probative of victim's lack of credibility. []

The jury heard other evidence undermining victim's credibility. For example, victim testified that, to conceal the fact that she had downplayed the alleged molestation when confronted by her father, she told Tori that her father was not going to do anything because of money problems. Relatedly, victim hid the extent of the molestation from her father. She denied that the picture on defendant's cell phone depicted her when her mother confronted her. She effectively testified that she invented her explanation to investigators for why the first alleged incident ended, saying she "was trying to find a reason for why it had ended" and that "seemed like the closest to the truth." And victim's credibility with respect to the uncharged rapes was impeached with her prior inconsistent testimony about those incidents. Evidence of the acquittals was, accordingly, cumulative of other evidence defendant used to undermine victim's credibility generally and with respect to the uncharged rapes specifically. It is not likely, therefore, that evidence of the acquittals would have impacted the decision of a juror to credit victim's testimony about the alleged conduct related to the video recordings.

We acknowledge that the jury deliberated for more than three days and hung on nine of 11 charges. . . . And, as noted, the jury had to credit victim's testimony as to the use of force to convict defendant of counts 8 and 10. Nevertheless, given the pretext call's strong corroboration of the other elements of those counts, the other evidence available to defendant to undermine victim's credibility, and the slight probative value of the acquittals, we cannot say it is reasonably probable the jury would have reached an outcome more favorable to defendant had it learned of the acquittals.

Poletti, 240 Cal. App. 4th at 1204-1207.

At the outset, Petitioner argues that AEDPA deference does not apply because the Court of Appeal did not rule on Petitioner's argument that the failure to admit into evidence the acquittals violated his federal right to due process. ECF No. 1 at 97. Indeed, the Court of Appeal did not

mention federal law in rejecting Petitioner's claim regarding the trial court's failure to introduce evidence of the acquittals under state law.  <u>Poletti</u>, 240 Cal. App. 4th at 1204-1207.  As the Supreme Court explained in <u>Johnson v. Williams</u>,  however, when a state court addresses some of the claims raised by a defendant but not the federal claim which the defendant then presses in a federal habeas case, the habeas court should still presume the claim was adjudicated on the merits and apply AEDPA deference unless the presumption is rebutted.  <u>Johnson v. Williams</u>, 568 U.S. 289, 293 (2013).  The Court explained that the presumption applies because a state court is not likely to "regard a fleeting reference to a provision of the Federal Constitution or federal precedent as sufficient to raise a separate federal claim" or "may simply regard a claim as too insubstantial to merit discussion."  <u>Id.</u> at 299-300.  Moreover, if, as here, a defendant brings a state and federal law claim for the same issue, and the state-law rule "is at least as protective as the federal standard-then the federal claim may be regarded as having been adjudicated on the merits."  <u>Id.</u> at 301.

A defendant may rebut the presumption by showing that the state standard is less protective than the federal standard fairly raised.  <u>Id.</u> at 301-302.  Petitioner argues that the presumption is rebutted because the Court of Appeal applied a state harmlessness review to the claim, rather than the more protective federal prejudice standard.  ECF No. 1 at 98-99.   Because Petitioner offers no federal law to support his claim that the Fourteenth Amendment provided him the right to introduce evidence of the acquittals, and no such federal law exists, <u>see supra</u>, and because state law does provide the protection Petitioner seeks, <u>see People v. Griffin</u>, 66 Cal. 2d 459 (1967), Petitioner's argument is a non-starter.  It is clear that state law is more protective than federal law on this point regardless of which hypothetical prejudice standard might apply to an error under that law.

 Moreover, the presumption is not rebutted where the state court relied on state law which clearly discusses federal law.  <u>Johnson</u>, 568 U.S. at 304, 306.  While the Court of Appeal relied primarily upon state law which did not incorporate or discuss federal law, <u>Griffin</u>, 66 Cal. 2d 459, the Court of Appeal also discussed <u>Griffin</u>'s progeny <u>Mullens,</u> which does discuss federal law.  <u>People v. Mullens</u>, 119 Cal. App. 4th 648, 669 n.9, <u>as modified on denial of reh'g</u> (July 16, 2004) ("The admission of acquittal evidence under the <u>Griffin</u> rule to rebut the propensity evidence

assures fundamental fairness and protects the defendant's due process right to a fair trial and the right to present a defense."). Therefore, this Court concludes that the Court of Appeal was aware that the failure to introduce acquittal evidence "implicated both state and federal law," in support of the presumption that the Court of Appeal addressed the federal claim on the merits. Johnson, 568 U.S. at 306 (2013).

The presumption is also not rebutted where the defendant's papers to the state court made no effort to develop the basis for the federal claim, or simply mentioned the federal precedent in passing before the state court. Id. at 301-302. The petitioner did place his federal argument in a separate portion of his brief to the Court of Appeal, but he did not meaningfully develop the claim. ECF No. 10-29 at 77-78 (arguing in a single paragraph only that the failure to instruct on the acquittals violated "federal constitutional rights to due process, a fair trial, and to present a defense" but failing to explain why or how the failure violated the Petitioner's federal rights). The Court of Appeal may well have determined that the federal argument was "[in]sufficient to raise a separate federal claim" or "too insubstantial to merit discussion." Johnson, 568 U.S. at 299-300. For these several reasons, the Court concludes that the presumption that the Court of Appeal considered Petitioner's federal claim regarding introducing the acquittals on the merits was not rebutted and accordingly AEDPA deference applies.

Applying AEDPA deference, the Court concludes the Court of Appeal did not rule in a way that was contrary to or an unreasonable application of clearly established federal law, because there is no clearly established federal law which entitles a defendant to introduce evidence of his acquittals into evidence. Even "Petitioner concedes that there is no Supreme Court case holding that a trial court's precluding a jury from learning that a defendant was acquitted of crimes of which he was accused by a prosecution witness violates due process . . . ." ECF No. 1 at 96. There is Supreme Court law regarding whether state evidentiary rulings violate federal due process, but this law does not support Petitioner's contention that the trial court's ruling deprived him of due process or any other right in the federal constitution. "'Incorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected.'" Whelchel v. Washington, 232 F.3d 1197, 1211 (9th Cir. 2000)) (citation omitted). The exclusion

1    of even relevant evidence does not violate due process, unless the state court's ruling offends a

2    "fundamental principle of justice."  Montana, 518 U.S. at 42-43.  Moreover, the Supreme Court

3    "has never held that the Confrontation Clause entitles a criminal defendant to introduce extrinsic

4    evidence for impeachment purposes." Nevada v. Jackson, 133 S. Ct. 1990, 1994 (2013) (emphasis

5    in original).  Petitioner does not attempt to argue that the Court of Appeal's decision was contrary

6    to any clearly established federal law, and this Court concludes it was not.  ECF No. 1 at 91-106.

7                    **4.        Cumulative Error**

8           Petitioner claims he was prejudiced by the cumulative effect of the foregoing asserted

9    errors.  In some cases, although no single trial error is sufficiently prejudicial to warrant reversal,

10   the cumulative effect of several errors may still prejudice a defendant so much that his conviction

11   must be overturned.  Alcala v. Woodford, 334 F.3d 862, 893-95 (9th Cir. 2003).  Where there is

12   no single constitutional error existing, nothing can accumulate to the level of a constitutional

13   violation.  Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011).  Here, no single constitutional error

14   has been found.  Accordingly, Petitioner is not entitled to habeas relief on this claim.

15   **C.        Certificate of Appealability**

16          The federal rules governing habeas cases brought by state prisoners require a district court

17   that issues an order denying a habeas petition to either grant or deny therein a certificate of

18   appealability.  See Rules Governing § 2254 Case, Rule 11(a).

19          A judge shall grant a certificate of appealability "only if the applicant has made a

20   substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the

21   certificate must indicate which issues satisfy this standard.  Id. § 2253(c)(3).  "Where a district

22   court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c)

23   is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district

24   court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S.

25   473, 484 (2000).

26          Here, petitioner has not made such a showing, and, accordingly, a certificate of

27   appealability will be denied.

28

# CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated:  January 31, 2018

_____
JON S. TIGAR
United States District Judge